**UNITED STATES of America,
Appellee,**

v.

**John Edward GALLOWAY, Appellant.**

**UNITED STATES of America,
Appellee,**

v.

**Thurman Edward TERRY, Appellant.**

**Nos. 10341, 10400.**

United States Court of Appeals
Fourth Circuit.

Argued June 1, 1966.

Decided Oct. 7, 1966.

Sol E. Abrams and J. D. Todd, Jr., Greenville, S. C. (Abrams, Bowen & Townes, and Leatherwood, Walker, Todd & Mann, Greenville, S. C., on brief), for appellant in No. 10,341.

J. Wiley Brown, Greenville, S. C., for appellant in No. 10,400.

Albert Q. Taylor, Jr., Asst. U. S. Atty. (John C. Williams, U. S. Atty., on brief), for appellee.

Before SOBELOFF, BOREMAN and BRYAN, Circuit Judges.

PER CURIAM:

John Edward Galloway and Thurman Edward Terry appeal from their jury conviction of conspiracy to sell distilled spirits in violation of the internal revenue laws and wilfully and knowingly operating a still without furnishing the bond required by law. Galloway also appeals from his conviction of operating an unregistered still.[1] Their joint appeal raises the sole issue of the sufficiency of the evidence to support the convictions. We conclude that the evidence adduced at trial was sufficient as to both defendants.[2]

On August 5, 1963, Treasury Department agents, armed with a federal search warrant, seized an illicit still located in a shed behind the residence of codefendant Clarence Olin Freeman, and also a blue Volkswagen panel truck containing 60 cases of used one-gallon syrup jars. The following day, the agents confiscated over 5000 pounds of sugar and several hundred cases of one-gallon and half-gallon jars from the basement of Terry's house. Earlier, on July 31, a blue Tempo panel truck, containing 197 gallons of nontaxpaid whiskey, was seized after leaving Freeman's home and codefendant Carl Nicholson was arrested as he attempted to flee from the truck.

The evidence chronicled Terry's and Galloway's activities between July 18 and August 6, during which time they were kept under close and constant surveillance

---

1. The pertinent Internal Revenue Code provisions are 26 U.S.C.A. §§ 5601(a), 5205(a), 5604(a), 5602, and 7206(4) (1965).

2. Three other conspirators, Clarence Olin Freeman, Carl Nicholson and Marion Cortez Plumblee, pleaded guilty to all three counts. Mrs. Clarence Olin Freeman, Bruce McMurray Horton and Melford John Sherman were named as coconspirators but were not indicted.

by the agents. The agents' testimony meticulously detailed the workings of the conspiracy. They portrayed the travels of the conspirators to and from the still and enumerated and described the times and places of their meetings.

Terry's participation in the conspiracy was convincingly demonstrated by his possession of inordinately large reserves of sugar and glass jars, both essential to the successful operation of a still and not easily explained as incident to his small retail grocery business. Although Terry had purchased an aggregate of more than 23,000 pounds of sugar within a four-month period, each separate purchase was for only 180 pounds, presumably because the wholesalers with whom he dealt would be required to report to the Internal Revenue Service any sale of sugar in excess of 200 pounds. In contrast, the evidence showed that after the raid his purchases of sugar were drastically reduced, amounting to only 680 pounds in the following month. In addition, other defendants were observed at various times loading the Tempo at Terry's home and after each such occasion the truck was later seen at the still.

Galloway's connection with the conspiracy is a more subtle one. He was never observed at the still or seen loading or unloading either the Tempo or the Volkswagen and none of the raw materials or finished product was ever shown to have been in his physical possession. His participation in the conspiracy and the substantive violations rests on a series of circumstances, not on direct testimony. But the circumstantial evidence, if believed, was strong enough to warrant reasonable men to infer guilt beyond a reasonable doubt.

The Government's theory is that Galloway was the "brains" behind the organization and did not expose himself by participating in the actual operation of the still. The evidence reveals that the Volkswagen seized at the still was in Galloway's possession for a considerable time during the life of the conspiracy. Apparently, codefendant Plumblee had delivered the Volkswagen to Galloway without license plates and Galloway procured and attached his own, but later, before it was turned over by him to the other defendants to replace the seized Tempo, he removed the license plates he had affixed to it. Whether Galloway or someone else attached the set of plates found on the Volkswagen when the agents seized it at the still is not shown. Galloway's version is that these maneuvers were innocent and unrelated to the liquor law violations. His testimony was that the Volkswagen was lent to him by Plumblee for use in Galloway's paving business.

There were frequent meetings between Galloway and the other defendants while the conspiracy was afoot. These occurred under circumstances not readily susceptible to explanation as innocent incidents of an employer-employee relationship in the paving business, as Galloway obliquely, though not directly, contends. Most of these meetings occurred in the early morning hours at the 291 Bypass Restaurant, a frequent meeting place of the conspirators, located only several blocks from Galloway's place of business. On the morning of August 1, the day after the Tempo had been seized, Galloway was observed making a phone call from a booth outside the restaurant, and he appeared considerably agitated. After the telephone call Galloway entered the restaurant and was joined several minutes later by Plumblee. An agent partially overheard their conversation in which "Carl," Nicholson's first name, was mentioned several times. Plumblee was overheard to say to Galloway, "Do you want me to pick him up?".

Galloway's testimony that Plumblee and Nicholson were in his regular employ in the paving business is belied by the relatively few salary checks in small amounts paid to them. No evidence was introduced showing the nature of their employment in that business. Galloway also visited Terry's home twice, and on one occasion Terry was overheard saying to him, "How about bringing your wife on one trip?". It was for the jury to weigh Galloway's explanation that these

visits were incident to some paving work which Galloway's firm had done for Terry.

A bank deposit slip containing several names and telephone numbers was found in Freeman's home on the day the still was raided. One name and number had been obliterated but scientific analysis showed that it was Galloway's. Freeman, called as a defense witness, admitted on cross-examination that he had made the erasures "[b]ecause I didn't want to get him [Galloway] connected with me if I got caught." Freeman further testified that he did not erase another name from the list because that person had never been tried "for a liquor case," while he had heard that Galloway had been previously tried for such an offense.

The record discloses sufficient evidence implicating both Terry and Galloway as active members of the conspiracy and supporting their conviction on all counts of the indictment. It was for the jury, who saw and heard the witnesses, to determine credibility and to evaluate the conflicting inferences. We perceive no reason to disturb the jury's resolution of the issues.

Affirmed.